**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| J.R., *by and through his parent and* *natural guardian James Redden*, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 18-574 |
| | ) | Judge Nora Barry Fischer |
| PENNS MANOR AREA SCHOOL DISTRICT, | ) ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.    Introduction

Before the Court is a motion to dismiss (Doc. No. 8) filed by the Penns Manor Area School District ("the school district").  For reasons that follow, the motion will be granted.

### II.    Background

This case presents a constitutional issue in the context of a middle school student's right to free speech at school.

J.R. (also referred to herein as plaintiff) was a 12-year-old student at Penns Manor Area Junior High School up until his expulsion on April 5, 2018.  Compl., Doc. No. 1 ¶ 5.  On or about February 28, 2018, at approximately 7:30 AM, J.R. was in the school lunchroom with fellow classmates discussing "who they would shoot if they were to do a school shooting."  Doc. No. 1-2.  According to the complaint, another student had started the conversation.  Doc. No. 1 ¶ 7.

During this discussion, yet another student, who was not part of the conversation, overheard J.R. discussing how he would shoot one of his teachers, Ms. Jamie Cortazzo.  *Id.* ¶

8. That student reported the conversation to the administration. Sometime between 10 AM and 11 AM, guidance counselor Lisa Donatelli questioned J.R. and other students about the conversation. *Id.* ¶¶ 10, 13. J.R. admitted that he told fellow classmates he would shoot his teacher, and he told the guidance counselor he would "carry out the activity" using a pistol.[1] *Id.* ¶ 11. When Ms. Donatelli asked J.R. why he would shoot Ms. Cortazzo, he responded by stating that "she makes him do school work." *Id.* ¶ 12.

Following the interview with the guidance counselor, J.R. returned to class to finish the school day. J.R. attended a class taught by Ms. Cortazzo. J.R. did not behave inappropriately during her class. Nevertheless, as explained in the complaint, J.R. "continued the conversation throughout the day, with other fellow students, repeating he would shoot Ms. Cortazzo, if there was a school shooting." *Id.* ¶ 17.

School officials contacted J.R.'s parents at approximately 2:30 PM. Ms. Cortazzo was notified of the incident later that evening. *Id.* ¶ 20. The school principal also wrote a disciplinary report that same day, charging J.R. with committing a terroristic threat. *Id.* ¶ 21. J.R. was suspended, pending an expulsion hearing before the school board.

The expulsion hearing took place on or about March 20, 2018. *Id.* ¶ 23. At the hearing, the school principal stated that he did not believe J.R. posed an immediate threat. *Id.* Although J.R. is "familiar" with guns because he hunts with his father, testimony showed that no one in J.R.'s household owns a pistol. *Id.* ¶ 24. Ms. Cortazzo testified at the hearing that she was "upset" and "sad" that someone would want to kill her. *Id.* ¶ 27.

---

[1] Based on the complaint, it is unclear whether J.R. made comments about the pistol to his fellow classmates, the guidance counselor, or both. At oral argument, counsel for plaintiff stated that J.R. only made comments about the pistol to the guidance counselor. Hr'g Tr., Doc. No. 19 at 16–17.

During the hearing, J.R. requested that, if he was expelled from school, he should be permitted to attend a cyber school, as opposed to the school district's recommended placement, Adelphoi Village. The hearing officer at the expulsion hearing ultimately recommended expulsion and placement at Adelphoi. The school board agreed with the hearing officer's recommendation, expelling J.R. for one year.

On May 1, 2018, J.R., by and through his parents, filed the above-captioned suit. He alleges a violation of his First Amendment right to free speech (Count I).[2] He further challenges his expulsion, arguing that the school district's decision amounted to "error of law" (Count II) because there was "insufficient evidence" (Count III). The school district filed a motion to dismiss on May 31, 2018. Doc. No. 8. The Court held oral argument on July 25, 2018. Doc. No. 17. The motion has been fully briefed (see Doc. Nos. 9, 11, 15, 20, 21) and is ripe for disposition.

### III. Jurisdiction

The Court exercises subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

---

[2] Although neither party raises this issue, the complaint does not cite or otherwise invoke 42 U.S.C. § 1983. Given that J.R. seeks damages against the school district for an alleged violation of his constitutional rights, the Court questions the propriety of the complaint on this ground. The Court further questions the ability of J.R. to seek punitive damages against the school district. "Punitive damages claims are barred against municipalities under § 1983." *Mitros v. Cooke*, 170 F. Supp. 2d 504, 507 (E.D. Pa. 2001) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)). Nevertheless, the Court need not address these issues in detail. As discussed *infra*, J.R. has failed to allege any deprivation of a constitutional right.

## IV. Standard of review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 220–21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" *Twombly*, 550 U.S. at 556, it does require a pleading to show "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. Avoiding dismissal under Rule 12(b)(6) thus requires a pleading party's complaint to provide "enough factual matter" to allow the case to move beyond the pleading stage of litigation; the pleader must "nudge his or her claims across the line from conceivable to plausible." *Phillips*, 515 F.3d at 234–35 (quoting *Twombly*, 550 U.S. at 556, 570) (brackets omitted).

In deciding a 12(b)(6) motion, courts in this circuit apply a three-step analysis: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679; *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011)).

In making the third determination in this three-step analysis, the Court must be mindful that the matter pleaded need not include "detailed factual allegations," *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555), and, as noted, it must construe all alleged facts, and draw all inferences gleaned therefrom, in the light most favorable to the non-moving party. *Id.* at 228 (citing *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003)). Moreover, a pleading party need only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assoc., Ltd.*, No. 08-207, 2008 WL 2312671 (W.D. Pa. June 4, 2008)). A well-pleaded complaint, even when "it strikes a savvy judge that actual proof of [the] facts is improbable," will not be dismissed if the pleader demonstrates that his or her claim is plausible. *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555–56).

Nevertheless, the facts provided must raise the expectation of relief above a purely speculative level, which includes more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 554–56). Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief." *Id.* "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678).

**V.     Discussion**

The Court now turns to the instant motion to dismiss.  As explained by the Third Circuit, "[t]he public school environment presents special challenges for determining the extent of the First Amendment's protections."  *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 415–16 (3d Cir. 2003).  Moreover, our circuit court has yet to fully address First Amendment protections in the context of threats against teachers in a school environment.  The issue is one of first impression.

Accordingly, the Court begins its discussion with the legal framework used to assess the constitutionality of restrictions on student speech in public schools.  It will then address (1) the complexity of student free speech cases, (2) legal approaches courts have used in the context of students who threaten school violence, and (3) additional Third Circuit case law that is relevant to our inquiry.  Finally, the Court will assess the viability of the complaint using this legal framework.

The Court ultimately concludes that J.R.'s constitutional rights were not violated.  The school district had the authority to discipline J.R. for language that school officials could reasonably perceive as promoting school violence.

**A.     The legal framework for restrictions on speech in school**

Public school students are protected by the First Amendment and do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  In *Tinker*, students decided to wear black armbands to protest the Vietnam War.  School officials learned of the plan and then adopted a policy prohibiting students from wearing armbands.  When a few students refused to

remove the armbands, the school suspended them. Noting that the conduct was "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance," *id.* at 508, the Court explained, "In order for . . . school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. The Court then formulated the "substantial disruption" test that permits school officials to suppress student expression if school officials reasonably conclude that the speech will "materially and substantially disrupt the work and discipline of the school." *Id.* at 513; *see also Morse v. Frederick*, 551 U.S. 393, 403 (2007) (describing the *Tinker* holding).

Notably, under the *Tinker* standard, school officials need not wait for an actual disruption to occur before they act. "The question [under *Tinker*] is not whether there has been actual disruption, but whether school officials might reasonably portend disruption from the student expression at issue." *Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008); *see also Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place."); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001). But, the "expectation of disruption" must be "well-founded." *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003); *see also Sypniewski v. Warren Hills Reg'l Bd. of Ed.*, 307 F.3d 243, 253 (3d Cir. 2002); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 928 (3d Cir. 2011) (authorities must reasonably "forecast [a] substantial disruption").

Following *Tinker*, the Supreme Court formulated three other exceptions to freedom of expression in public schools. Although *Tinker* remains the "general rule for regulating school

speech," *J.S.*, 650 F.3d at 927, school officials can regulate "lewd, vulgar, indecent, and plainly offensive speech in school." *Id.* (internal quotation marks omitted) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)). School officials can also "regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern." *Id.* (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001)) (as set forth in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)). Finally, given the "special characteristics of the school environment . . . and the governmental interest in stopping student drug abuse," school officials can "restrict student expression that they reasonably regard as promoting illegal drug use." *Morse v. Frederick*, 551 U.S. 393, 408 (2007).

As these cases demonstrate, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Moreover, the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506).

**B.      Challenges in applying the First Amendment in the school environment**

Despite four decades of jurisprudence on the topic, courts struggle with First Amendment issues in public schools. A delicate balance must be struck between student expression and society's often countervailing interest in teaching students the boundaries of socially appropriate behavior. *See S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 422 (3d Cir. 2003). Indeed, school officials must have significant discretionary decision-making ability to maintain a safe environment that is conducive to learning. *See id.*

Part of the struggle also stems from the *Tinker* framework, and the Supreme Court's patchwork of exceptions where *Tinker* does not apply at all. As explained by Justice Thomas in his concurring opinion in *Morse*:

> [W]e continue to distance ourselves from *Tinker*, but we neither overrule it nor offer an explanation of when it operates and when it does not. . . I am afraid that our jurisprudence now says that students have a right to speak in schools except when they do not—a standard continuously developed through litigation against local schools and their administrators.

The *Morse* majority also acknowledges that its precedent is not "entirely clear." 551 U.S. at 405. "Whatever approach *Fraser* employed, it certainly did not conduct the 'substantial disruption' analysis prescribed by *Tinker*." *Id.* To that end, lower courts must often ponder how a given scenario might fit within the applicable Supreme Court jurisprudence. One such scenario, as relevant here, occurs when a student threatens violence against fellow students or teachers.

### C.     Approaches to threats of student violence

As a result of the horrific instances of school violence occurring on school grounds in recent years, school administrators have been increasingly more aggressive in adopting zero tolerance policies when it comes to students who threaten violence. *See, e.g.*, DIANE HECKMAN, J.D., JUST KIDDING: K-12 STUDENTS, THREATS AND FIRST AMENDMENT FREEDOM OF SPEECH PROTECTION, 259 ED. LAW REP. 381, 382 (2010); DAVID HUDSON, FIRST AMENDMENT CENTER, STUDENT EXPRESSION IN THE AGE OF COLUMBINE: SECURING SAFETY AND PROTECTING FIRST AMENDMENT RIGHTS (Vol. 6 No. 2, Sept. 2005)[3] ("In the age of Columbine, zero tolerance has spread from drugs and weapons to controversial student speech.").

---

[3] This publication can be found online at the following address: https://www.freedomforuminstitute.org/wp-content/uploads/2016/10/First.Report.student.speech.pdf.

Courts have also been tasked with determining whether threatening language should be constitutionally protected, particularly when a student claims that his or her expression was nothing more than a harmless joke or creative fiction. "Students have been punished for dark poetry, rap songs, Halloween essays, doodles of teachers and students with sticks in their heads and other material." *See* HUDSON, *supra*, at 1–2. Some commentators argue that school administrators have, at times, overreacted at the expense of suppressing students' constitutional rights. *See id.* Nevertheless, federal courts have uniformly agreed that language reasonably perceived as threatening school violence is not constitutionally protected — whether such language is written or oral, and whether it occurs at school or elsewhere. *See S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 423 (3d Cir. 2003); *Johnson v. New Brighton Area Sch. Dist.*, No. CIV A 06-1672, 2008 WL 4204718, at *1 (W.D. Pa. Sept. 11, 2008); *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 985 (11th Cir. 2007); *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 714 F. Supp. 2d 462, 469 (S.D.N.Y. 2010), aff'd, 677 F.3d 109 (2d Cir. 2012); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 39 (2d Cir. 2007); *D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 386 F. Supp. 2d 119, 125 (E.D.N.Y. 2005), aff'd sub nom. *D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 180 F. App'x 232 (2d Cir. 2006); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001); *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007).

Most courts have applied a *Tinker* analysis, reasoning that threats of school violence might reasonably lead authorities to forecast a substantial disruption or material interference with school activities or discipline. *See Johnson v. New Brighton Area Sch. Dist.*, No. CIV A 06-1672, 2008 WL 4204718, at *1 (W.D. Pa. Sept. 11, 2008); *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 985 (11th Cir. 2007); *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 714 F. Supp. 2d

462, 469 (S.D.N.Y. 2010), aff'd, 677 F.3d 109 (2d Cir. 2012); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist*., 494 F.3d 34, 39 (2d Cir. 2007); *D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist*., 386 F. Supp. 2d 119, 125 (E.D.N.Y. 2005), aff'd sub nom. *D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist*., 180 F. App'x 232 (2d Cir. 2006); *LaVine v. Blaine Sch. Dist*., 257 F.3d 981, 992 (9th Cir. 2001).

Another, more novel approach was announced in *Ponce v. Socorro Indep. Sch. Dist*., 508 F.3d 765 (5th Cir. 2007).  There, a high school student, E.P., kept a diary, written in first-person, in which a pseudo-Nazi group planned to commit a Columbine shooting attack at the school.  E.P. showed another student the diary who then reported it.  E.P. claimed that his diary was a work of fiction.  In holding that school officials did not violate E.P.'s First Amendment rights, the Fifth Circuit was guided by the Supreme Court's decision in *Morris*, discussed *supra*, which held that school officials could restrict student expression that promotes illegal drug use.

The *Ponce* court relied heavily on Justice Alito's concurring opinion in *Morse*, quoting as follows:

> [A]ny argument for altering the usual free speech rules in the public schools cannot rest on a theory of delegation but must instead be based on some special characteristic of the school setting. *The special characteristic that is relevant in this case is the threat to the physical safety of students*. School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate. Similarly, students, when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. *Experience shows that schools can be places of special danger*.

*Ponce*, 508 F.3d at 770 (emphasis in original) (quoting *Morse v. Frederick*, 551 U.S. 393, 424 (2007)).  According to the Fifth Circuit:

> [Justice Alito's] concurring opinion therefore makes explicit that which remains latent in the majority opinion: ***speech advocating a harm that is demonstrably grave and that derives that gravity from the "special danger" to the physical safety of students arising from the school environment is unprotected***.

*Id.* at 770 (emphasis added).  To that end, the *Ponce* court found that restricting student speech was appropriate on grounds of student safety.  "We find it untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of E.P.'s diary would not have taken some action based on its violent and disturbing content."  *Id.* at 771 (brackets and internal quotations omitted).

Finally, the *Ponce* court reasoned that, if school officials could restrict language reasonably promoting illegal drug use, they should likewise be able to restrict language that threatens school violence.  "If school administrators are permitted to prohibit student speech that advocates illegal drugs . . . then it defies logical extrapolation to hold school administrators to a stricter standard with respect to speech that gravely and uniquely threatens violence."  *Id.* at 771–72.  The Eleventh Circuit has also corroborated this view.  *See Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007) (discussing *Morse* and stating that its "same rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence.")

### D.    Additional Third Circuit guidance

The Third Circuit has yet to fully address threats of school violence in the First Amendment context, particularly in a junior or high school setting.  Nevertheless, this Court is

guided by two relevant factors in other student free-speech cases, including (1) the age of the student at issue and (2) whether the speech occurred at school or out of it.

First, with respect to student age, *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 423 (3d Cir. 2003), is instructive. There, the court upheld a school board's decision to discipline a 5-year-old elementary school student who told a fellow student, "I'm going to shoot you," during a game at recess of cops and robbers. In finding that the student's First Amendment rights were not violated, the court emphasized the student's young age and the impressionability of young children:

> We need not decide in this case whether or if, under what circumstances, a school may violate an elementary school student's right to freedom of speech. For our purposes, it is enough to recognize that a school's authority to control student speech in an elementary school setting is undoubtedly greater than in a high school setting . . . Although S.G. argues that the boys were only playing a game, the determination of what manner of speech is inappropriate properly rests with the school officials.

*Id*. at 423.

Student age is thus a factor that should be considered in a free-speech analysis. In addition, the Third Circuit affords substantial deference to school officials when determining whether speech is appropriate in the school environment, particularly when it comes to younger students. *See id.*

Second, Third Circuit precedent establishes that the First Amendment often prohibits school officials from reaching beyond the schoolyard to "impose what *otherwise* might be appropriate discipline." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 207 (3d Cir. 2011) (emphasis added). In *Layshock*, a high school student created a parody "MySpace" profile of his principal that contained lewd and offensive language. The student created the profile at home, though news of it "spread like wildfire" at school. *Id.* at 208.

Noting that the school district had conceded the profile did not cause a substantial disruption at school, the Court found that disciplining the student violated the First Amendment:

> It would be an unseemly and dangerous precedent to allow the state, in the guise of school authorities, to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities. Allowing the District to punish [the student] for conduct he engaged in while at his grandmother's house using his grandmother's computer would create just such a precedent . . .

650 F.3d at 216. Therefore, a student free-speech analysis should, at minimum, consider whether the speech at issue occurred at school or out of it. *See also Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446, 454 (W.D. Pa. 2001) ("Although there is limited case law on the issue, courts considering speech that occurs off school grounds have concluded . . . that school officials' authority over off-campus expression is much more limited than expression on school grounds.")

###### E.    Analysis of First Amendment issue

In view of the *Tinker* and *Morse* standards, the Court finds that J.R. has failed to state an actionable constitutional claim. First, school officials were well within their right to discipline J.R. under the substantial disruption test announced in *Tinker*. Second, even if the *Tinker* standard did not apply in the instant case, this Court is guided by *Morse* and the analytical approach set forth by the Fifth Circuit in *Ponce*. *See supra* Part V(C). Put simply, given the vital governmental interest in the safety of students and teachers in the school environment, officials had the ability to discipline J.R. for speech that was reasonably perceived as a threat of school violence.

### 1. The *Tinker* standard

With respect to the *Tinker* analysis, school officials can discipline students for speech if they can demonstrate facts that "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. As discussed above, the test is not whether there has been an actual disruption, but whether school officials can show an "expectation of disruption" that is well-founded. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003); *see also Sypniewski v. Warren Hills Reg'l Bd. of Ed.*, 307 F.3d 243, 253 (3d Cir. 2002). "School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007).

Using the familiar Rule 12(b)(6) standard, this Court must construe all alleged facts, and draw all inferences gleaned therefrom, in the light most favorable to plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008.). But, plaintiff must plead facts that would render his claim plausible. *Id.* at 234. J.R. has pled the following:

- At the time of the incident, J.R. was a 12-year-old student in middle school (Compl., Doc. No. 1-2 ¶ 5);

- The incident occurred during school hours, at approximately 7:30 AM, in the school lunchroom (*Id.* ¶ 6);

- J.R. admitted to his guidance counselor that he and fellow students had been discussing "who they would shoot if they were to do a school shooting" (*Id.* ¶ 7; see also Doc. No. 1-2 exhibit A);

- J.R. further admitted to his guidance counselor that he told fellow classmates he would shoot one of his teachers, Jamie Cortazzo (Doc. No. 1-2 ¶ 8);

- J.R. explained to his guidance counselor that he would shoot his teacher because she "makes him do school work" (*Id.* ¶ 12);

- J.R. told his guidance counselor "how he would carry out the activity," in that he would "use a pistol" (*Id.* ¶ 11; Hr'g Tr., Doc. No. 19 at 17);

- A fellow classmate overheard the conversation in the lunchroom and immediately reported it to school officials (Doc. No. 1-2 ¶ 9);

- J.R. apparently "continued the conversation" with other students throughout the school day (*Id.* ¶ 17).[4]

The Court assumes these factual allegations as true. In doing so, it has little difficulty in finding that school officials have met their burden under *Tinker* and that J.R. has failed to state an actionable constitutional claim. School authorities could reasonably forecast substantial disruption or material interference with school activities because J.R. engaged in conversations with fellow classmates about who he would shoot if he were involved in a school shooting. J.R. not only discussed participating in a school shooting, he explicitly identified his teacher as a potential victim. J.R. told his guidance counselor how he would carry out the shooting (i.e., with a pistol), and he even explained why he would target his teacher (i.e., she makes him do schoolwork). J.R. made these troubling comments to his peers and to his

---

[4] At oral argument, counsel for plaintiff stated that, although J.R. repeated the same conversation throughout the school day, the context of the repeated statements is not clear. "There is no indication as to whom he made the statement, who heard the statement, what exactly was said . . . There is none of that . . . In terms of who exactly — whether it was the same set of students, a different set of students, whether any other students around heard, that's what I mean by the context." Hr'g Tr., Doc. No. 19 at 31. Plaintiff concedes, at minimum, that he made comments about school shootings on more than one occasion that day. Furthermore, the Court finds it somewhat perplexing that the "context" is so unclear given that counsel for plaintiff could simply ask her client about the surrounding circumstances of the repeated statements. Indeed, it is plaintiff's duty to investigate the legal and factual bases of his or her claims. *See, e.g.*, ABA MODEL RULE OF PROFESSIONAL CONDUCT 3.1; *In re Girardi*, 611 F.3d 1027, 1036 (9th Cir. 2010) (discussing the duty to make a reasonable and competent inquiry).

guidance counselor, and he spoke loudly enough so that at least one other student overheard the conversation and reported it to school staff. J.R. even repeated his conversation about school shootings on more than one occasion that day. Without doubt, a middle school student who engages in conversations about school shootings with classmates might cause a substantial disruption in school activities and discipline. To that end, the "forecast of substantial disruption" is reasonable and well-founded. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 928 (3d Cir. 2011); *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003).

Nothing about the speech at issue runs contrary to *Tinker* or its progeny. This was not a "silent, passive expression on opinion" on the Vietnam War, "entirely divorced from actually or potentially disruptive conduct," *Tinker*, 393 U.S. at 505; nor did school authorities act with "undifferentiated fear or apprehension of disturbance" simply to avoid "discomfort and unpleasantness that always accompany an unpopular viewpoint," *id.* at 510. Rather, J.R.'s disturbing comments amounted to a threat of violence against one of his teachers and the student body at large. The First Amendment permits "reasonable regulation of speech-connected activities in carefully restricted circumstances." *Id.* at 512. The *Tinker* Court even commented that the armbands at issue did not cause "*threats or acts of violence on school premises*." *Id.* at 508 (emphasis added). In this Court's estimation, school officials acted appropriately to discipline J.R. for his statements. The suppression of student speech under these circumstances was entirely reasonable.

### 2. J.R.'s arguments

J.R. argues that his comments did not cause a substantial disruption to school activities. He points to school officials allowing him to complete his school day after the comments were made. Doc. No. 11 at 8. He further claims that he engaged in the conversation "jovially," and with other students. *Id.* Moreover, J.R. claims that school officials did not take his words seriously, as demonstrated by the fact that he completed the school day and attended Ms. Cortazzo's class. *Id.* Even further, he claims that his comments were "conditional" — a "hypothetical scenario," in that he explained who he would shoot "if" there was a school shooting. *Id.* at 8, 9. And, finally, he argues that he did not have the capacity to carry out any threat because he is not familiar with pistols, and none of his family members own one. Doc. No. 19 at 17.

These arguments are not persuasive. As discussed above, the standard is not whether an actual disruption occurred, but whether a forecast of substantial disruption is reasonable and well-founded. *See Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416 (3d Cir. 2003); *Sypniewski v. Warren Hills Reg'l Bd. of Ed.*, 307 F.3d 243, 253 (3d Cir. 2002).

Furthermore, to the extent J.R. claims that school officials did not take his threat seriously, the complaint suggests otherwise. The school guidance counselor became involved quickly and interviewed J.R. and fellow students. The police were ultimately called later that afternoon, along with J.R.'s parents. *See* Doc. No. 19 at 18. The school principal wrote a disciplinary report that day, charging him with committing a terroristic threat. Doc. No. 1-2 ¶ 21. School officials also notified Ms. Cortazzo later that evening. J.R. was immediately suspended, and he was ultimately expelled from school for one year. Certainly, these

allegations, taken as true, show that the school district took the comments seriously and reasonably perceived them as threatening.

Next, J.R. claims that he made his comments "jovially" with friends. Even if J.R. intended for his comments to be a joke or some "hypothetical scenario," the fact remains that he made statements school officials reasonably perceived as amounting to threats of school violence; those statements were made publicly, at school, in front of his fellow classmates, and he admitted to his guidance counselor that he made them. Furthermore, under *Tinker*, "[I]t is the objective reasonableness of the school administrators' response, rather than the student's private intentions, that are relevant." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 714 F. Supp. 2d 462, 469 (S.D.N.Y. 2010), aff'd, 677 F.3d 109 (2d Cir. 2012); *Morse*, 551 U.S. at 401. Not to mention, in every other instance where a court has ruled against a student in a free-speech case involving threats of student violence, the students made similar arguments— namely, that their words were meant as a joke, creative fiction, or otherwise taken out of context. This argument has never been convincing.[5]

Finally, to the extent J.R. claims that he did not have the capacity to carry out the threat because he is not familiar with pistols and does not have access to one, this argument is likewise unavailing. "[W]hether or not [a student] had the capacity [to carry out the threat] or was at all likely to do so, is not dispositive, and indeed has only minimal relevance." *Cuff,* 714 F. Supp.

---

[5] See, for example: *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 423 (3d Cir. 2003); *Johnson v. New Brighton Area Sch. Dist.*, No. CIV A 06-1672, 2008 WL 4204718, at *1 (W.D. Pa. Sept. 11, 2008); *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 985 (11th Cir. 2007); *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 714 F. Supp. 2d 462, 469 (S.D.N.Y. 2010), aff'd, 677 F.3d 109 (2d Cir. 2012); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 39 (2d Cir. 2007); *D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 386 F. Supp. 2d 119, 125 (E.D.N.Y. 2005), aff'd sub nom. D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist., 180 F. App'x 232 (2d Cir. 2006); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001); *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007).

2d at 469. "[N]otwithstanding the fact that [the student] might have been unable to perform the specific violent act he threatened. [E]ven an unsuccessful attempt at violence has significant disruptive potential, as does the making of the threat itself." *Id.* (internal quotation marks omitted). Furthermore, to require school officials to conduct a detailed capacity assessment prior to acting on a student's threats of violence is both unrealistic and unwarranted. School officials must have the ability to react to threats of school violence, regardless of whether the student has the actual capacity to carry out the threat. *See, e.g., id.* (reasoning that a capacity assessment "would place educators in an untenable position, and place students and teachers at an unreasonable risk of danger"); *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir.2007) ("School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance."); *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007) ("We can only imagine what would have happened if the school officials, after learning of [the student's notebook where she discusses a 'dream'], did nothing about it and the next day [the student] did in fact come to school with a gun and shoot and kill her math teacher. In our view, it is imperative that school officials have the discretion and authority to deal with incidents like the one they faced in this case.").

### 3. *Morse*, *Ponce*, and Third Circuit guidance

Even assuming plaintiff had a valid argument that school officials could not reasonably forecast substantial disruption, as required by *Tinker*, this Court is further guided by the analysis in *Morse* and *Ponce*, and the Third Circuit cases discussed *supra*, in Parts V(C) and (D). Indeed,

it is uncertain whether the Third Circuit would even apply a *Tinker* analysis in the context of a threat of school violence in a middle or high school setting. To that end, *Morse* and *Ponce* are instructive, along with the additional factors often considered by the Third Circuit (i.e., the age of the student and whether the speech occurred at school).

As discussed above, the *Morse* court did not rely on the substantial disruption analysis announced in *Tinker*. Rather, the Court identified a "vital" governmental interest in stopping student drug abuse that justified school officials in exercising control over student speech even in the absence of substantial disruption. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 107 (3d Cir. 2013). School officials, therefore, can "restrict student expression that they reasonably regard as promoting illegal drug use" without any reliance on *Tinker*. *See Morse*, 551 U.S. at 408.

The Fifth Circuit in *Ponce* used the *Morse* analysis, particularly Justice Alito's concurring opinion, to hold that speech advocating school violence is unprotected. 508 F.3d at 772. The rationale for this content-based restriction to student speech is grounded upon the "special danger to the physical safety of students arising from the school environment." *Ponce*, 508 F.3d at 770 (citing *Morse*, 551 U.S. at 424). The *Ponce* court went even further in reasoning that, if school officials are permitted to prohibit student speech advocating illegal drug use, it would defy "logical extrapolation" to hold that school administrators cannot likewise restrict speech that threatens school violence. *Id.* at 771–72.

The *Ponce* analysis is compelling. It is difficult to imagine a more vital governmental interest than promoting safety and deterring school shootings and other violent acts committed by schoolchildren. As explained in *Morse*, school officials have a difficult job, and they are charged with protecting those "entrusted to their care." 551 U.S. at 395. School officials must

send a "powerful message" to students about just how serious they take that responsibility. *See id.* at 410. Given the special characteristics of the school environment and given what appears to be an endless number of tragic acts of school violence now occurring in our society, school officials must be able to discipline students who threaten or otherwise encourage school violence.

Furthermore, as explained in Part V(D), the Third Circuit has considered the age of the student and whether the form of expression took place at school as being important considerations in any student free-speech analysis. Both factors provide additional support in finding that there has been no violation of J.R.'s constitutional rights. J.R. was a 12-year-old student in junior high school, and he made his threatening comments publicly, on school grounds, during the school day, and in front of his peers. Under these circumstances, school officials should be afforded substantial deference in their determination that J.R.'s manner of speech was extremely inappropriate and thus subject to severe discipline.

For all these reasons, J.R. has failed to state an actionable constitutional claim. Count I will therefore be dismissed. This claim will be dismissed with prejudice because amendment would be futile.[6] *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 246 (3d Cir. 2008); *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007) ("Our precedent supports the notion that in civil rights cases district courts must offer amendment—

---

[6] Amendment would be futile because J.R. has conceded the relevant facts that are dispositive to his constitutional claim. Regardless of any amendments to his complaint, or any future discovery, that will not change the fact that J.R. made statements about shooting his teacher, and he made these comments to his peers and to his guidance counselor. The Court recognizes the Third Circuit's guidance of liberal amendment, particularly in civil rights cases. The Court is also mindful, as plaintiff suggests, that First Amendment cases are often fact-intensive inquiries that require well-developed records. Doc. No. 20 at 9–10. Nevertheless, the relevant facts are not in dispute, and J.R. has had the benefit of an extensive disciplinary hearing that has already led to a well-developed record. Although J.R. requests the need to "develop an adequate evidentiary record" that is fundamental to his constitutional challenge, see Doc. No. 20 at 9, he provides no explanation about how discovery would change the Court's analysis. Put simply, there are no other facts that would otherwise render plaintiff's claim plausible.

irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); *Ne. Revenue Servs., LLC v. Maps Indeed, Inc.*, 685 F. App'x 96, 103 (3d Cir. 2017).

### F. The remaining state law claims

As a final matter, J.R. challenges the results of his expulsion hearing, arguing that the school district's decision amounted to "error of law" (Count II) because there was "insufficient evidence" (Count III). The basis for these counts appears to be grounded in Pennsylvania statutes that permit judicial review of final decisions of governmental agencies. *See* 42 Pa. Cons. Stat. Ann. § 933; 2 Pa. Cons. Stat. Ann. § 752. The school district argues that the courts of common pleas have exclusive jurisdiction over appeals of local agency adjudications, such as the one at issue here. *See generally* Doc. No. 21.

This Court need not determine whether the state courts have exclusive jurisdiction over these claims. At best, Counts II and III could only be heard in this forum if this Court exercised supplemental jurisdiction. It will not do so because J.R. cannot state a plausible constitutional claim, and the remaining state law claims implicate matters more appropriately determined by the state courts. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . if the district court has dismissed all claims over which it has original jurisdiction"); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point

toward declining to exercise jurisdiction over the remaining state-law claims."). Counts II and III of the complaint, therefore, will be dismissed without prejudice.

### VI. Conclusion

For the reasons stated herein, the motion to dismiss will be granted. An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: January 2, 2019

cc/ecf: All counsel of record.